JS-CAND 44 (Rev. 07/16)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
SERVANDO MORALES

**DEFENDANTS**
Relypsa Inc., et al.,

**(b)** County of Residence of First Listed Plaintiff ALAMEDA, CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant San Mateo, CA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Evan Smith, Brodsky & Smith, LLC, 9595 Wilshire Blvd., Ste. 900, Beverly Hills, CA 90212, 877-534-2590

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment Of Veteran's Benefits
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury – Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities–Employment
- ☐ 446 Amer. w/Disabilities–Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee– Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC § 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC § 158
- ☐ 423 Withdrawal 28 USC § 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS–Third Party 26 USC § 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC § 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☒ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation–Transfer
- ☐ 8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
Violations of Sections 14(a) & 20(a) of the Exchange Act

Brief description of cause:
Breach of Fiduciary Duty

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE Hon. William H. Orrick DOCKET NUMBER 3:16-cv-04605-WHO

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

**(Place an "X" in One Box Only)** ☒ **SAN FRANCISCO/OAKLAND** ☐ **SAN JOSE** ☐ **EUREKA-MCKINLEYVILLE**

**DATE:** 08/15/2016 **SIGNATURE OF ATTORNEY OF RECORD:** [signature]

**BRODSKY & SMITH, LLC**
Evan J. Smith, Esquire
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Phone: (877) 534-2590
Facsimile: (610) 667-9029
esmith@brodsky-smith.com

*Attorneys for Plaintiff Servando Morales*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SERVANDO MORALES, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>RELYPSA, INC., DANIEL K. SPIEGELMAN, JOHN P. BUTLER, PAUL J. HASTINGS, KENNETH J. HILLAN, DAVID W. J. McGIRR, JOHN A. ORWIN, THOMAS J. SCHUETZ, and HELEN TORLEY,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiff Servando Morales ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, alleges upon personal knowledge as to his own acts and upon information and belief as to all other matters, based upon the investigation made by and through his attorneys, which investigation included, *inter alia*, the review of United States Securities and Exchange Commission ("SEC") filings, press releases, analyst reports, news articles and other materials, as follows:

**NATURE OF THE CASE**

1. Plaintiff brings this stockholder class action on behalf of himself and all other public stockholders of Relypsa, Inc. ("Relypsa" or the "Company"), against Relypsa and the Company's Board of Directors (the "Board" or the "Individual Defendants) for violations of

Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S,C. §§78n(d)(4) 78n(e), 78t(a), and United States Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. § 240.14d-9(d) ("Rule 14d-9"), in connection with the acquisition of Relypsa by Galenica AG, and Vifor Pharma USA Inc. ("Vifor" or "Merger Sub," collectively with Galenica AG, "Galenica.

2. On July 21, 2016, Relypsa and Galenica jointly announced that they had entered into an Agreement and Plan of Merger (the "Merger Agreement") that will culminate in Galenica, through Merger Sub, acquiring all of the outstanding shares of Relypsa through an all-cash tender offer (the "Tender Offer"). Under the terms of the merger agreement, Relypsa public stockholders will receive $32.00 in cash for every share of Relypsa common stock held, for an approximate aggregate value of $1.53 billion (the "Proposed Acquisition").

3. In the Solicitation/Recommendation Statement filed by Defendants on form 14D-9 with the SEC on August 4, 2016 (the "Recommendation Statement"), defendants failed to disclose all material information necessary for Relypsa stockholders to make an informed decision regarding the Proposed Acquisition. Specifically, the Recommendation Statement omits and/or misrepresents material information concerning, among other things: (1) the background of the Proposed Acquisition; (2) the data and inputs underlying the financial valuation exercises that purportedly support the so-called "fairness opinions" provided by Relypsa's financial advisors, Centerview Partners LLC ("Centerview") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch"); and (3) Relypsa's financial projections, relied upon by Centerview and BofA Merrill Lynch.

4. Notably, as evidenced by the Recommendation Statement, the sales process leading up to the Proposed Acquisition was rife with actions so favored to Galenica that they could have only been intentional or reckless on the part of the Relypsa Board. The entire transaction, in fact stems from the initial relationship between Relypsa and Galenica involving the licensing of the drug Veltassa outside of the United States.

5. Furthermore, the Company engaged a conflicted financial advisor Centerview from the beginning of the sales process, knowing two months in advance of entering into the Merger

Agreement that Centerview had been simultaneously engaged by Galenica to work as a financial advisor on other matters. Notably, Centerview as financial advisor was responsible for the market check discussed with the Company Board that only solicited two new potential third parties in addition to the three parties that had already independently contacted the Company, one of which was never ultimately contacted. Rather than end the relationship with the clearly conflicted Centerview, the Company instead chose to keep them on and also engage BofA Merrill Lynch at the eleventh hour, ensuring that the latter's financial analyses would be constrained by the tight time period in which they had to operate and wasting stockholder assets in unnecessarily retaining two financial advisors.

6. The Individual Defendants, as defined herein, have agreed to lock up the Merger with preclusive and onerous deal protection devices that preclude other bidders from making successful competing offers for the Company and act to render the Merger a fait accompli. For example, the Board agreed to: (i) a "no solicitation" provision that prevents the Company from negotiating with or providing confidential information to competing bidders except under extremely limited circumstances; (ii) a "matching rights" provision that allows Galenica to match any competing proposal in the unlikely event that one emerges; and (iii) up to $49,000,000 in termination fees if the Board agrees to a competing proposal.

7. Absent judicial intervention, the merger will be consummated, resulting in irreparable injury to Plaintiff and the Class. Immediate judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders. Plaintiff, on behalf of the Class, seeks only to level the playing field and to ensure that if stockholders are to be ultimately stripped of their respective equity interests through the Proposed Acquisition, that the Proposed Acquisition is conducted in a manner that is not overtly improper, unfair and illegal, and that all material information concerning the Proposed Acquisition is disclosed to the Relypsa stockholders so that they are able to make informed decisions as to whether to vote in favor or against the Proposed Acquisition.

## PARTIES

8. Plaintiff, Servando Morales, is an individual. The Plaintiff is, and at all times relevant hereto, has been a Relypsa stockholder and is a resident of California.

9. Defendant Relypsa is a Delaware corporation with its principal place of business located at 100 Cardinal Way, Redwood City, CA 94063. Relypsa is a biopharmaceutical company that focuses on the discovery, development, and commercialization of polymeric medicines for patients with conditions that are overlooked and undertreated and can be addressed in the gastrointestinal tract, and operates primarily in the United States. The company offers Veltassa (patiromer), a non-absorbed potassium binding polymer for the treatment of hyperkalemia. It has license agreement with Vifor Fresenius Medical Care Renal Pharma Ltd. ("VFMCRP", a Galenica-affiliated entity) for developing and commercializing Veltassa outside the United States and Japan. Relypsa common stock is publicly traded on the NasdaqGS under the symbol "RLYP." As of May 2, 2016, there were over 44 million common shares of Relypsa stock outstanding.

10. Defendant Daniel K. Spiegelman ("Spiegelman") has been a director of the Company at all relevant times. Additionally, Spiegelman serves as the Chairman of the Board.

11. Defendant John P. Butler ("Butler") has been a director of the Company at all relevant times.

12. Defendant Paul J. Hastings ("Hastings") has been a director of the Company at all relevant times.

13. Defendant Kenneth J. Hillan ("Hillan") has been a director of the Company at all relevant times.

14. Defendant David W.J. McGirr ("McGirr") has been a director of the Company at all relevant times.

15. Defendant John A. Orwin ("Orwin") has been a director of the Company at all relevant times. In addition, Orwin serves as the President and Chief Executive Officer ("CEO") of Relypsa.

16. Defendant Thomas J. Schuetz ("Schuetz") has been a director of the Company at all relevant times.

17. Defendant Helen Torley ("Torley") has been a director of the Company at all relevant times.

18. Defendants Spiegelman, Butler, Hastings, Hillan, McGirr, Orwin, Schuetz, and Torley are collectively referred to as the "Individual Defendants."

19. Non-Defendant Galenica is a Swiss company with principle offices located at Untermattweg 8, Bern, 3027, Switzerland. Galenica is the owner of Switzerland's largest pharmacy network, and manufactures and distributes pharmaceuticals and other related services. The Company produces prescription and over-the-counter drugs, toiletries and hygiene products, and operates pharmacies. Galenica is traded on the SIX Swiss Exchange under the ticker symbol "GALN".

20. Non-Defendant Merger Sub is a Delaware Corporation and wholly owned subsidiary of Galenica created for the sole purpose of effectuating the Proposed Acquisition

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Rule 14(e), 14(d)(4) and Section 20(a) of the Exchange Act.

22. Venue is proper in this Court because the Defendants reside, are found, have agents and regularly transact business in this District as provided in 28 U.S.C. § 1391(b) and (c).

## SUBSTANTIVE ALLEGATIONS

***Company Background***

23. Relypsa is a biopharmaceutical company that focuses on the discovery, development, and commercialization of polymeric medicines for patients with conditions that are overlooked and undertreated and can be addressed in the gastrointestinal tract, and operates primarily in the United States. The company offers Veltassa (patiromer), a non-absorbed potassium binding polymer for the treatment of hyperkalemia.

24. Relypsa has a demonstrated history of financial success, recently evidenced by its 2016 Q1 financials that were released on May 4, 2016. Notably, the Company announced several positive results related to their flagship product, Veltassa, including that 2,498 new patients started

taking the drugs, of which 1,155 were outpatient prescriptions that were covered by payers and dispensed, and 374 of which were hospital/institution units that were sold. Furthermore, it was reported that across all payer plans, Veltassa has broad coverage with more than 80 percent of all plans covering to date.

25. Additionally, the results announce that the Centers for Medicare and Medicaid Services (the "CMS") had included Veltassa in its Current Year 2016 Formulary Reference File and agreements were signed with Express Scripts and CVS Caremark, the two largest pharmacy benefit managers in the U.S.

26. Perhaps most importantly, Relypsa announced positive results from Phase 1 drug-drug interaction studies with Veltassa, and initiated a Phase 4 study evaluating the drug's safety and efficacy when given with and without food.

27. Discussing these results, Defendant Orwin noted that, "We made great progress in our first full quarter with Veltassa on the market. We saw solid month-over-month growth of prescriptions, reported early success with payers, including agreements with the two largest pharmacy benefit managers, and have had a positive reception from treating physicians." Orwin went on to discuss a series of debt financing to promote the launch of Veltassa, stating, "Yesterday, we announced a debt financing that will support the ongoing U.S. launch of Veltassa".

28. Orwin concluded by touching on positive future prospects for the Company abroad, noting that, "In addition, with the recent submission of an MAA requesting European approval of Veltassa, we are another step closer to bringing Veltassa to patients outside the United States."

29. Such an incredible showing over not only the previous quarter, but also throughout 2015, indicates a true sea-change for the Company, and is the culmination of consecutive positive financial results for Relypsa over the last year. For example, on February 24, 2016, the Company released its Q4 and full-year financial results for the 2015 year. Notably, the Company announced that Veltassa for oral suspension was approved by the U.S. Food and Drug Administration ("FDA") for the treatment of hyperkalemia on October 21, 2015 and became available for prescription to patients on December 21, 2015. Additionally, the press release announced that Relypsa had entered into an exclusive collaboration and license agreement with VFMCRP for the

development and commercialization of Veltassa outside the United States and Japan, as well as announcing a co-detailing agreement with Sanofi for promotion of the drug in the United States.

30. Most impressively, the Company announced that it had experienced significant growth during 2015, adding almost 300 employees, including a sales force of 133 individuals, and labeling the year "transformative."

31. This is most evident in the financial results that the company began to realize in 2015, for example, collaboration and license revenue for the fourth quarter and full year of 2015 was $12.0 million and $18.6 million, respectively, which compared to no such revenues for similar periods in 2014. Clearly, the commercialization of Veltassa had immediate effects on the prospects of Relypsa.

32. The Company also posted an impressive growth rate on those patients who received the new drug Veltassa, by various means:

| | December 21-31, 2015 (partial month) | January 1-31, 2016 (full month) | February 1-12, 2016 (partial month) | Total launch through February 12, 2016 |
|---|---|---|---|---|
| Patients who received free starter-supply of Veltassa | 26 | 409 (average 102/ week) | 380 (average 190/ week) | 815 |
| Outpatient prescriptions filled (retail TRx) | 0 | 99 (average 25/week) | 133 (average 67/week) | 232 |
| Hospital/institution units sold (non-retail) | 3 | 56 (average 14/week) | 41 (average 21/week) | 100 |

33. Speaking on these overwhelmingly positive results, Defendant Orwin stated, "2015 was a pivotal year for Relypsa with the FDA approval of Veltassa marking our transition to a fully integrated commercial-stage company. We are proud to be among those who have the privilege of delivering a new medicine to people in need and the opportunity to transform the treatment of a condition that has long been a challenge for doctors."

34. Orwin also took a moment to comment on the exciting future growth prospects of the Company, "We are looking forward to another exciting year. We are very pleased with the

initial demand for Veltassa and, following a positive meeting with the FDA, plan to submit a sNDA requesting a label change based on the results of the Phase 1 drug-drug interaction studies."

35. Those in the media have not been silent about Veltassa's impact on the Company's prospects, with many in the financial media commenting on the Company's future. For example, Nida Ahmed at *BidnessEtc* stated in a July 12, 2016 article that the Company was "headed for soaring growth via Veltassa success." The article goes on further to note that Veltassa and Relypsa are well placed to continue posting positive results after ZS-9, a competing product by AstraZeneca, received a rejection from the FDA, delaying its approval.

36. The article goes on to continue to praise Veltassa, calling it the "first-ever" FDA approved hyperkalemia drug in over 50 years. The article also notes other recent Relypsa wins, such as trying to get rid of the FDA "black box" warning on Veltassa, further enhancing its competitive abilities against ZS-9; the article quotes Wedbush analyst Liana Moussatos who states, "Given these results, we believe Relypsa is likely to be successful in requesting the FDA remove the black box warning…"

37. Separately, Manikandan Raman writing for *Benzinga* noted in a July 12, 2016, article that there appears to be "Steady Growth" for Relypsa's Veltassa Launch, and also noting that analysts at Wedbush have maintained its Outperform rating and $51 price target on Relypsa, saying that the sixth full month of Veltassa's launch figures show growth in all categories, including revenue-generating outpatient prescriptions.

38. Clearly, the analysts in the media have pegged Relypsa and its products to be on the cusp of major profits. However, the Plaintiff and other members of the class of public Relypsa stockholders will forever be foreclosed from reaping the ultimate profits of their investments

***The Flawed Process Leading to the Proposed Acquisition***

39. In January 2015, representatives of Centerview and Latham & Watkins met with the Relypsa Board and members of management to discuss considerations relevant to a possible unsolicited proposal to acquire Relypsa from Party A or other third parties. However, Relypsa did not engage Centerview as Relypsa's financial advisor and Relypsa did not receive any acquisition proposals at this time.

40. Throughout 2014 and 2015, Relypsa continued to engage in formal and informal discussions with potential collaboration or licensing partners for Veltassa in Europe and Japan.

41. On August 10, 2015, Relypsa entered into the License Agreement with VFMCRP, an affiliate of Galenica, to commercialize Veltassa outside of the United States and Japan. The negotiation of the License Agreement did not include any discussion with VFMCRP or Galenica regarding a potential acquisition of Relypsa by VFMCRP or Galenica.

42. On October 21, 2015, the FDA approved Veltassa for oral suspension for the treatment of hyperkalemia.

43. On December 4, 2015, a financial news website, citing an unidentified source, released an article stating that Merck & Co. ("Merck"), a global pharmaceutical company, intended to make a non-binding offer to acquire Relypsa, and other financial news websites subsequently reported that three or four companies other than Merck were evaluating an acquisition of Relypsa, again citing unidentified sources. Relypsa did not have any discussions with Merck or any other companies regarding an acquisition of Relypsa at that time, and did not receive an acquisition proposal from Merck or any other companies. Relypsa did not comment on the rumors.

44. On December 21, 2015, Veltassa became available for prescription in the United States.

45. On April 7, 2016, Reuters, citing unidentified sources, reported that Relypsa was "exploring a sale following overtures from a number of potential buyers," and that Relypsa had engaged Centerview to assist Relypsa in reviewing offers. Relypsa was not exploring a sale and had not received overtures or proposals regarding an acquisition of Relypsa at that time. In addition, while Centerview had met with the Relypsa Board and senior management of Relypsa in early 2015 to review strategic alternatives that might be available to Relypsa, Relypsa had not engaged Centerview to assist it in connection with a sale process or otherwise. Relypsa again did not comment on the rumors.

46. Also on April 7, 2016, a representative from Party B, a global pharmaceutical company, left a telephone message with a representative of Centerview inquiring about the Reuters

article and asking whether Relypsa was in fact undertaking a sale process. Centerview did not return the phone call.

47. On April 8, 2016, a representative of Galenica telephoned a representative of Centerview, inquired about the Reuters' article, asked whether Relypsa was in fact undertaking a sale process, and informed Centerview that Galenica would be interested in exploring a potential acquisition of Relypsa. Later that day, representatives from Centerview contacted Orwin and informed him of the outreach by Galenica and Party B.

48. On April 12, 2016, Stefan Schulze ("Schulze") CEO of VFMCRP contacted Orwin to request a meeting in order to discuss the recent events related to the licensing agreement for Veltassa between the two companies and other recent news regarding Relypsa.

49. On April 12, 2016, Company B against contacted Certerview to inquire about Relypsa engaging in a sales process. Centerview advised Company B to contact Relypsa directly regarding such inquiries.

50. On April 18, 2016, Orwin spoke to Chairman Defendant Spiegelman, and discussed the April 8, 2016 phone call from a Galenica to Centerview. They also discussed Orwin's upcoming meeting with Schulze, and the fact that Schulze might express interest on behalf of Galenica and VFMCRP in exploring a potential acquisition of Galenica.

51. Also on April 18, 2016, Orwin met with Schulze, at which meeting Schulze informed Orwin that Galenica would be interested in exploring a potential acquisition of Relypsa. Schulze also described Galenica's strategic rationale for a potential acquisition of Relypsa, including the anticipated separation of Vifor Pharma Ltd. ("Vifor Pharma") (Galenica's subsidiary and one of the equity holders of VFMCRP, Relypsa's collaboration partner in Europe) from Galenica, and requested that Relypsa provide Galenica with access to due diligence information in order to permit Galenica to further evaluate a potential proposal to acquire Relypsa. Schulze did not discuss the potential value that Galenica would ascribe to Relypsa or any of the other terms of a potential transaction at that time. During the meeting, Schulze suggested that Orwin meet the following day with Dr. Christoph Springer ("Springer"), Deputy Chief Executive Officer of VFMCRP, and Schulze facilitated such a meeting over e-mail.

52. On April 19, 2016, Orwin met with Springer who reiterated that Galenica would be interested in exploring a potential acquisition of Relypsa and described Galenica's strategic rationale for a potential acquisition of Relypsa, including the strategic importance of leveraging Relypsa's existing commercial infrastructure to help promote sales of Vifor Pharma's and VFMCRP's approved commercial products in the United States. Springer did not discuss the potential value that Galenica would ascribe to Relypsa or any of the other terms of a potential transaction at that time.

53. On April 22, 2016, Orwin spoke with Spiegelman over the phone to provide updates on the meetings with Schulze and Springer.

54. On April 25, 2016, the Relypsa Board held a meeting, with members of management and representatives of Latham & Watkins participating. Orwin provided updates regarding his meetings with senior management of VFMCRP and Galenica's interest in a potential acquisition of Relypsa. Orwin noted that Galenica had not made an offer to acquire Relypsa and had not indicated the value that it might be prepared to ascribe to Relypsa or any of the other terms of a potential acquisition. The Relypsa Board authorized management to provide access to certain additional due diligence materials to Galenica to enable Galenica to further consider a non-binding proposal to acquire Relypsa.

55. The Relypsa Board also requested that management explore an engagement of Centerview to assist the Relypsa Board and Relypsa management in connection with an evaluation of strategic alternatives available to Relypsa, including continuing to operate as a stand-alone business or any proposal that might ultimately be submitted by Galenica or any other third party.

56. On April 26, 2016, representatives of senior management of Relypsa, Vifor Pharma and VFMCRP held a conference call to discuss additional due diligence to be performed by Galenica on Relypsa and its business in connection with a potential offer by Galenica to acquire Relypsa.

57. On May 3, 2016, Relypsa announced the closing of $150 million in aggregate principal amount of senior secured term loans.

58. On May 8, 2016, Relypsa entered into an NDA with Galenica with respect to a potential acquisition of Relypsa, which was later amended on May 11, 2016. The confidentiality agreement with Galenica does not contain a standstill provision. Between May 8, 2016 and July 20, 2016, representatives of Galenica and VFMCRP and their advisors worked with representatives of Relypsa and its advisors to conduct additional detailed due diligence with respect to Relypsa and its business, Relypsa and its advisors responded to due diligence requests received from Galenica and VFMCRP and their advisors, and representatives of Relypsa and its advisors participated in due diligence meetings and conference calls with representatives of Galenica and VFMCRP and their advisors.

59. On May 9, 2016, Orwin received a telephone call from the Chief Executive Officer of Party B who indicated that Party B would be interested in exploring a potential acquisition of Relypsa and requested that Party B be permitted to conduct due diligence with respect to Relypsa and its business. The Chief Executive Officer of Party B did not discuss the value it would ascribe to Relypsa or any of the other terms of a potential transaction.

60. On May 10, 2016, Galenica was provided access to a virtual data room with respect to Relypsa and its business.

61. On May 18, 2016, Springer called Orwin and informed him that Galenica intended to deliver a non-binding written proposal to acquire Relypsa for $29.00 per Share in cash. Springer requested a response from Relypsa to Galenica's proposal by May 24, 2016.

62. On May 18, 2016, following his call with Springer, Orwin received a non-binding written proposal by e-mail on behalf of Galenica offering to acquire all of the outstanding Shares at a price of $29.00 per Share in cash. The non-binding proposal stated that the acquisition would be structured as a two-step tender offer and merger and would be subject only to customary closing conditions, including antitrust approvals. The non-binding proposal also indicated that Galenica viewed the current Relypsa management team as an integral part of its decision to move forward with its proposal, that Galenica was focused on retaining Relypsa's talent and expertise, and that, at the appropriate time, Galenica looked forward to discussing the organizational structure of the combined company.

63. On May 19, 2016, Relypsa entered into an NDA with Party B with respect to a potential acquisition of Relypsa. The confidentiality agreement with Party B contains a standstill provision that terminated upon Relypsa's entry into the Merger Agreement.

64. On May 22, 2016, Defendant Butler, delivered an e-mail to Spiegelman, Orwin and Ronald Krasnow, Senior Vice President and General Counsel of Relypsa, stating that, at that time, Butler intended to recuse himself from the meeting of the Relypsa Board on the following day and any future discussions to the extent they related to Galenica's proposal to acquire Relypsa or any related transaction process.

65. On May 23, 2016, the Relypsa Board held a telephonic meeting, with members of management and representatives of Centerview and Latham & Watkins participating. Representatives of management and Centerview reviewed with the Relypsa Board the Galeni9ca $29.00 per Share cash offer. The Relypsa Board and the other participants in the meeting discussed Galenica, the License Agreement, and Relypsa's relationship with Galenica and VFMCRP. The Relypsa Board also discussed the timing of the proposal submitted by Galenica in light of the AstraZeneca's ongoing testing and approval process of ZS-9.

66. The Relypsa Board, Relypsa management and Centerview discussed a range of potential pharmaceutical and biotechnology companies that might have interest in an acquisition of Relypsa. At the Relypsa Board's request, Centerview reviewed five potential counterparties (including Galenica, Party A and Party B) that management and Centerview believed were most likely to be interested in an acquisition of Relypsa. The Relypsa Board, Relypsa management and Centerview also discussed a range of other pharmaceutical and biotechnology companies that the Relypsa Board might consider approaching in connection with a potential sale of Relypsa.

67. The Relypsa Board discussed Relypsa's response to Galenica and determined that it would not be in a position to respond to Galenica regarding the $29.00 per share price offered by Galenica until after the upcoming ZS-9 FDA review date and a review of such determination's impact on Relypsa and its business with management and Centerview. Following the discussion, the Relypsa Board instructed Centerview to communicate to Galenica's financial advisor, Credit Suisse, that, while the Relypsa Board had not made a decision to sell Relypsa and was not prepared

to respond at that time as to the price offered by Galenica, the Relypsa Board viewed Galenica's offer as constructive and, assuming that Galenica would be able to increase its offer, Relypsa would be receptive to further exploration of a potential acquisition by Galenica and to providing additional due diligence information to Galenica.

68. At the May 23, 2016 Relypsa Board meeting, the Relypsa Board also considered matters related to Centerview's engagement as a financial advisor to Relypsa with respect to a potential sale of Relypsa. Centerview reviewed Centerview's engagement by Galenica in connection with certain unrelated financial advisory matters, namely assisting Galenica in connection with the publicly announced separation of Vifor Pharma, and in connection with potential future acquisitions by Galenica. The Relypsa Board thereafter held discussions regarding Centerview's suitability to be engaged to serve as financial advisor to the Company for the sales process.

69. On May 25, 2016, members of management met with representatives from Party B to address due diligence questions in connection with a potential acquisition of Relypsa, and on May 27, 2016, Party B was provided access to a virtual data room with respect to Relypsa and its business. Between May 25, 2016 and June 2, 2016, representatives of Party B worked with representatives of Relypsa and its advisors to conduct additional due diligence with respect to Relypsa and its business, Relypsa and its advisors responded to due diligence requests received from Party B, and representatives of Relypsa participated in due diligence conference calls with representatives of Party B.

70. On May 27, 2016, AstraZeneca announced that the FDA issued a Complete Response Letter regarding ZS-9, communicating its decision that ZS-9 would not be approved in its present form.

71. On May 27, 2016, the Relypsa Board held a telephonic meeting, with members of management and representatives of Centerview and Latham & Watkins participating. The Relypsa Board and the other participants in the meeting discussed the recent FDA decision regarding ZS-9. The representatives from Centerview noted that they had informed Party B that the Relypsa Board would like to receive a preliminary non-binding proposal to acquire Relypsa by May 30,

2016. The representatives from Centerview again reviewed the five potential counterparties (including Galenica, Party A and Party B) that had been discussed with the Relypsa Board at its May 23, 2016 meeting. Following discussion, the Relypsa Board determined that contacting Party A and Party C was appropriate at that time.

72. On May 31, 2016, at the direction of the Relypsa Board, representatives of Centerview contacted Party C and inquired as to Party C's interest in a potential acquisition of Relypsa.

73. On June 1, 2016, Relypsa entered into an engagement letter with Centerview to assist Relypsa in its analysis and consideration of various strategic alternatives that may be available to Relypsa, including with respect to a potential sale.

74. Also on June 1, 2016, at the direction of the Relypsa Board, representatives of Centerview contacted Party A and inquired as to Party A's interest in a potential acquisition of Relypsa.

75. On June 2, 2016, a representative of Party B contacted a member of senior management of Relypsa by telephone and communicated that Party B believed an acquisition of Relypsa would be too large and too dilutive to Party B's earnings and that, as a result, Party B was not interested in exploring a potential acquisition of Relypsa.

76. On June 3, 2016, representatives of Party A contacted Centerview and indicated that Party A would be interested in further exploring a potential acquisition of Relypsa.

77. On June 7, 2016, Orwin spoke with Springer who informed him that Galenica's due diligence had been progressing well, that Galenica expected to present a revised non-binding offer to acquire Relypsa during the week of June 13, 2016, and that Etienne Jornod ("Jornod"), the Executive Chairman of Galenica and Chairman of VFMCRP, and members of the VFMCRP senior management team would like to visit Relypsa's to meet the Relypsa senior management team and further discuss Galenica's interest in an acquisition of Relypsa.

78. On June 8, 2016, Relypsa entered into an NDA with Party A with respect to a potential acquisition of Relypsa. Also on June 8, 2016, representatives of Relypsa management and representatives of Party A held a conference call to review due diligence matters with respect

to Relypsa. Between June 8, 2016 and June 24, 2016, representatives of Party A worked with representatives of Relypsa and its advisors to conduct additional due diligence with respect to Relypsa and its business, Relypsa and its advisors responded to due diligence requests received from Party A and representatives of Relypsa participated in due diligence conference calls with representatives of Party A. On June 14, 2016, Party A was provided access to a virtual data room with respect to Relypsa and its business.

79. On June 10, 2016, representatives of Party C contacted Centerview and communicated that Party C was not interested in pursuing a potential acquisition of Relypsa. Party C did not provide a reason for its determination not to pursue a potential acquisition of Relypsa.

80. On June 14, 2016, Springer called Orwin to express Galenica's continued interest in an acquisition of Relypsa, and informed him that Galenica intended to deliver a revised non-binding written proposal to acquire Relypsa later that day. Springer informed Orwin that the revised non-binding proposal would include a per share purchase price in the "low-$30's," and that Galenica was prepared to move quickly to finalize a transaction.

81. Later on June 14, 2016, the Relypsa Board held a telephonic meeting with members of management and representatives of Centerview and Latham & Watkins participating. Orwin summarized his call with Springer that had taken place earlier that morning. Representatives from Relypsa management and Centerview provided an update on discussions with Party A, Party B and Party C and on the ongoing diligence being conducted by Galenica and Party A. The Relypsa Board and the representatives of management and Centerview participating in the meeting discussed potentially contacting additional counterparties that might be interested in an acquisition of Relypsa. Following the discussion, the Relypsa Board determined not to contact other potential counterparties at that time.

82. The representatives from Centerview then left the June 14, 2016 Relypsa Board meeting, and the representatives of Relypsa management discussed with the Relypsa Board the potential engagement of a second financial advisor by Relypsa in light of Centerview's ongoing financial advisory work with Galenica, which had been previously reviewed with the Relypsa Board. Management reviewed with the Board a proposed engagement letter for BofA Merrill

Lynch after which the Board authorized management to finalize and execute such an engagement letter.

83. On June 14, 2016, following the meeting of the Relypsa Board, Orwin received a revised non-binding written proposal by e-mail from Galenica offering to acquire all of the outstanding Shares at a price of $30.25 per share in cash, which was otherwise consistent with previous offers.

84. Also on June 20, 2016, at a meeting of the Relypsa Board, representatives of Relypsa management Centerview, and BofA Merrill Lynch reviewed with the Relypsa Board the revised non-binding written proposal that had been received from Galenica to acquire all of the outstanding Shares at a price of $30.25 per Share in cash, and discussed interactions with a representative of Party A earlier that day. At this meeting, the Board also authorized Orwin to inform Jornod that an increased offer closer to $34.00 per share would be more likely to be supported by the Board. Jornod did not, however, revise Galenica's offer at the time but instead indicated that Galenica would be willing to explore a reduced upfront cash purchase together with a contingent value right tied to future Veltassa sales.

85. Also on June 20, 2016, the Relypsa Board formed a strategic transaction committee (the "Strategic Transaction Committee") consisting of Board members Spiegelman, McGirr, and Schuetz in order to facilitate the negotiation process with any counterparties in connection with a potential acquisition. The Board authorized the Strategic Transaction Committee to assist senior management and the Company's advisors in connection with the sales process and to provide guidance and advice with respect to negotiations with counterparties, subject to the ultimate approval of the full Board.

86. On June 23, 2016, Springer informed Orwin that Galenica was prepared to increase its non-binding proposal to acquire all of the outstanding Shares to a price of $32.00 per Share in cash.

87. On June 24, 2016, the Strategic Transaction Committee met, with members of management and representatives of Centerview and Latham & Watkins participating, at which time Orwin summarized his discussion with Springer and informed the Committee of the increase

to $32.00 per share. Following discussion, the Strategic Transaction Committee determined that it was in the best interests of Relypsa to further explore a potential transaction with Galenica, and authorized Orwin and the Company advisors to begin negotiating a definitive acquisition agreement with Galenica.

88. Orwin thereafter informed Springer that Relypsa was prepared to further explore a sale of the Company at $32.00 per share in cash.

89. On June 27, 2016, Party A informed Centerview that, while it remained interested in a potential acquisition of Relypsa, it would be difficult in light of valuation and other strategic priorities for Party A. Party A followed up on July 5, 2016, to inform Centerview that it would not be pursuing an acquisition of Relypsa at the time.

90. On July 6, 2016, Orwin spoke to Springer to discuss the status and timing of the potential acquisition and the treatment of outstanding Relypsa equity awards, amongst other things. On July 13, 2016, Orwin spoke to the acting CEO of Vifor Pharma, again regarding outstanding Relypsa equity awards and other things related to the potential acquisition.

91. Between July 17 and July 20, 2016, based on input from their respective clients, representatives of Latham & Watkins and outside counsel for Galenica negotiated the remaining terms of, and finalized, the Merger Agreement, pending approval by the Relypsa Board.

92. On July 20, 2016, the Relypsa Board met telephonically to consider the definitive Merger Agreement and a potential acquisition of Relypsa by Galenica and related matters. Representatives from Centerview, BofA Merrill Lynch and Latham & Watkins and members of Relypsa's senior management attended the meeting. The Relypsa Board also considered matters related to BofA Merrill Lynch's engagement as a second financial advisor to Relypsa with respect to a potential sale of Relypsa. Representatives from Latham & Watkins reviewed with the Relypsa Board the terms of the definitive Merger Agreement with Galenica.

93. Discussion among the members of the Relypsa Board and the other participants in the meeting regarding Relypsa, the Merger Agreement, the proposed acquisition by Galenica and Galenica's financing of the acquisition ensued. The representatives of Centerview then rendered to the Relypsa Board the oral opinion of Centerview, that the Galenica Offer and the Merger

pursuant to the Merger Agreement was fair, from a financial point of view, to such holders. The representatives of BofA Merrill Lynch also rendered to the Relypsa Board the oral opinion of BofA Merrill Lynch, that the Galenica Offer and the Merger was fair, from a financial point of view, to such holders.

94. After the meeting the Relypsa Board unanimously determined to approve the merger under the terms of the merger agreement.

95. The Proposed Acquisition was thereafter announced on July 21, 2016.

96. On August 4, 2016, the offer was commenced.

***The Proposed Acquisition***

97. On July 21, 2016, Galenica and Relypsa announced the Proposed Acquisition. The press release stated in relevant parts:

> **BERNE, SWITZERLAND, and REDWOOD CITY, Calif., July 21, 2016 –** Galenica Group (SIX: GALN) and Relypsa, Inc. (NASDAQ: RLYP) today announced that the companies have entered into a definitive agreement under which Galenica will acquire Relypsa. This transaction further strengthens Galenica's Business unit, Vifor Pharma, as the company will gain full global rights to the potassium binder Veltassa® (patiromer) for oral suspension and enhance its growing position as a global specialty pharmaceutical company. Under the terms of the merger agreement, Galenica will pay $32 per share in cash, or a total of approximately $1.53 billion. Through this acquisition, Vifor Pharma will gain a fully-integrated commercial organization in the United States and significantly strengthen its presence in the U.S. cardio-renal market, a key area of focus.
>
> **Transaction in Line With the Galenica Long-Term Growth Strategy**
>
> The transaction is in line with the Galenica strategy of growth through in-licensing and acquisitions that build on Vifor Pharma's emerging international leadership in cardio-renal and gastroenterology therapies. It provides Vifor Pharma with full global rights to Veltassa. It will also significantly enhance the commercial visibility and presence of Vifor Pharma in the key cardio-renal market in the United States, where Relypsa has already established a significant and powerful specialist sales force. With the combination of the assets and products of Vifor Pharma, Vifor Fresenius Medical Care Renal Pharma (VFMCRP) and Relypsa, Vifor Pharma is positioned to become a major player in the United States in its core therapy areas.
>
> The acquisition of Relypsa is expected to significantly strengthen Vifor Pharma ahead of the planned division of the Galenica Group into two independent companies in 2017, with an extensive specialist product portfolio to include both the intravenous iron deficiency treatment Ferinject® (ferric carboxymaltose) and Veltassa.

**Platform for Vifor Pharma to Become a Major Player in U.S. Cardio-Renal Market**

Relypsa is a biopharmaceutical company based in Redwood City, Calif., with more than 400 employees. The company, founded in 2007, is focused on the discovery, development and commercialization of polymeric medicines for patients with conditions that can be addressed in the gastrointestinal tract. Its lead product, Veltassa, was approved by the U.S. Food and Drug Administration (FDA) for the treatment of hyperkalemia in October 2015. Veltassa is the first medicine for treatment of people with elevated blood potassium levels to be approved in the United States in more than 50 years and the only hyperkalemia medicine with long-term data in its label supporting chronic use. Relypsa has developed an extensive specialist commercial organization in the United States targeting nephrologists and cardiologists and focused on developing market access and awareness. Hyperkalemia affects approximately 3 million people in the United States with stage 3 or 4 chronic kidney disease (CKD) and/or heart failure, giving Veltassa the potential to become a blockbuster medicine.

In August 2015, VFMCRP acquired the commercial rights to Veltassa outside the United States and Japan. Through the acquisition, Vifor Pharma will acquire the global rights to Veltassa. The medicine is currently under regulatory review in Europe.

"The combination of Vifor Pharma and Relypsa is an important step towards achieving our goal of building a world-leading specialty pharmaceutical company focused on nephrology, cardiology and gastroenterology medicines," said Etienne Jornod, executive chairman of Galenica. "This acquisition will give Vifor Pharma direct access to the key U.S. market, enabling us to maximize the potential of our compelling product portfolio and enhancing our growing attraction as an international partner of choice. This transaction demonstrates the commitment of the Galenica Board of Directors to achieve the separation of Vifor Pharma and Galenica Santé, with both businesses in the strongest possible position. We look forward to welcoming Relypsa to Vifor Pharma."

"We are very proud of the team that built Relypsa into the company it is today and brought Veltassa to patients in need. Vifor Pharma is a recognized international leader in the cardio-renal space that shares a strong commitment to patients and closely aligned values with Relypsa," said John A. Orwin, president and chief executive officer of Relypsa. "We are excited to announce this transaction today, which we believe offers significant and immediate value to our shareholders. We look forward to continuing our mission of improving patients' lives as part of the Vifor Pharma organization and are confident that our combined expertise, resources and commercial strength will help us build on the significant progress we have made since launching Veltassa in the United States."

**Offer Recommended by Relypsa Board of Directors**

Under the terms of the merger agreement, Galenica will commence a tender offer to acquire all of the issued and outstanding common stock of Relypsa for $32 per share. The implied fully-diluted equity value of the offer amounts to $1.53 billion.

The Boards of Directors of both Relypsa and Galenica have approved the terms of the merger agreement, and the Board of Directors of Relypsa has resolved to recommend that shareholders accept the offer, once it is commenced.

The acquisition is structured as an all-cash tender offer for all outstanding issued common stock of Relypsa followed by a merger in which remaining shares of Relypsa would be converted into the same U.S. dollar per share consideration as in the tender offer. The transaction is not subject to a financing condition.

**Completion Anticipated During the Third Quarter 2016**

Subject to customary conditions, including the tender of the majority of the outstanding Relypsa shares and the expiration or earlier termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, the transaction is expected to close during the third quarter of 2016. Relypsa is expected to be delisted from the NASDAQ and integrated into Vifor Pharma thereafter.

Vifor Pharma intends to retain the Relypsa leadership team in order to support the integration of Relypsa into Vifor Pharma, as well as the ongoing business and future development of Veltassa.

Credit Suisse acted as the sole financial adviser to Galenica for this transaction. Centerview and BofA Merrill Lynch acted as financial advisers to Relypsa.

Jones Day acted as the legal adviser to Galenica for this transaction. Latham & Watkins LLP acted as legal adviser to Relypsa.

**Financing and Proposed Division of Galenica Group**

As Galenica previously announced in May 2016, preparations continue for the division of the Galenica Group into two independent listed companies. The acquisition of Relypsa affirms the commitment of the Galenica Board of Directors to this strategy, adding further breadth and scale to the Vifor Pharma specialty portfolio.

Galenica has secured committed bridge loan financing from Credit Suisse which, in addition to the Galenica existing cash and cash equivalents, is available to finance the transaction.

Galenica plans to refinance a portion of the bridge loan through equity proceeds to be raised in conjunction with the envisaged division of the Group in the course of 2017, either through an initial public offering of Galenica Santé or through another option such as an equity increase. Galenica intends to raise sufficient equity to maintain implied investment grade ratings at both Vifor Pharma and Galenica Santé in the medium term after the separation of the Group

***The Inadequate Merger Consideration***

98. Significantly, analyst expectations, the Company's strong recent performance, high likelihood of future, and synergistic benefits to Galenica, establish the inadequacy of the merger consideration

99. The compensation afforded under the Proposed Acquisition to Company stockholders significantly undervalues the Company. Pursuant to the terms of the Merger Agreement, the transaction values Company stock at approximately $32.00 per share. Significantly, analysts tracking the Company have valued the Company significantly higher in recent months. Most notably, as recently as July 21, 2016, financial analysts at Wedbush had maintained its Outperform rating and $51 price target Relypsa, saying that the sixth full month of Veltassa's launch figures show growth in all categories, including revenue-generating outpatient prescriptions. Notably the $51.00 per share target is more than 59% greater than the consideration currently being offered to Relypsa stockholders.

100. Speaking on this valuation, Wedbush analyst Liana Moussatos wrote, "We are especially encouraged by the continued growth in revenue-generating outpatient prescriptions filled and view the growth as a sign of decreased insurer pushback and physicians becoming more comfortable prescribing Veltassa as a chronic treatment for hyperkalemia."

101. Additionally, analysts at Guggenheim valued the Company as high as $46.00 per share in November of 2015 and analysts at Nomura Holdings, Inc. valued the Company as high as $75.00 per share in October of 2015, or more than twice the amount offered in the Proposed Acquisition, thus rendering the consideration contained in the Proposed Acquisition as being virtually without a premium to the Plaintiff and other Company stockholders.

102. In addition, the Company has traded at a 52-week high of $35.00 per share, a figure 9.3% higher than the consideration being offered to stockholders in the Proposed Acquisition.

103. As previously stated, Relypsa's true value and the inadequacy of the merger consideration has not gone unnoticed by those in the media. For example, in a May 27, 2015 article, Lee Jackson at *24/7 Wall St.*, quoted Stifel analysts who stated that the Company had "big upside potential", and noted the Company has patent protection on Veltassa through 2030.

104. Additionally, *Real Money Pro*'s Bret Jensen recommended buying Relypsa stock in April of 2016, calling it "insanely low-priced given its fundamentals".

105. Furthermore, the consideration offered in the Proposed Acquisition does not take into account the considerable synergies afforded to Galenica as a result, who is seeking to beef up its drug unit, Vifor Pharma, before its planned spinoff later next year. Notably, Galenica Executive Chairman Etienne Jornod stated as much in the press release announcing the merger, "This acquisition will give Vifor Pharma direct access to the key U.S. market, enabling us to maximize the potential of our compelling product portfolio and enhancing our growing attraction as an international partner of choice."

106. Those in the media also noted the synergistic benefits to Galenica, with Shobhit Seth at *Investopedia* noting in a July 22, 2016 article that states, "The addition of Relypsa will bolster the Vifor unit," and, "Galenica is also expected to benefit from Relypsa's sales and distribution network, which has a deep penetration and a broader reach in the U.S."

107. Meanwhile, Galenica's statements regarding the Proposed Acquisition do not address the fact that the shares of Relypsa's common stockholders are being significantly undervalued, but instead focus on how this deal will help their own company. For example, Galenica's Chief Financial Officer, Joerg Kneubuehler stated in a conference call that "the acquisition is about growth" – clearly, the growth of Galenica at the expense of Relypsa and the Company's stockholders.

108. Accordingly, the Board has denied Relypsa's stockholders the fair and adequate value of their investment by entering into the Proposed Acquisition for inadequate consideration.

***Preclusive Deal Mechanisms***

109. The Merger Agreement contains certain provisions that unduly benefit Galenica by making an alternative transaction either prohibitively expensive or otherwise impossible. Significantly, the Merger Agreement contains a termination fee provision that requires Relypsa to pay up to $49 million to Galenica if the Merger Agreement is terminated under certain circumstances. Moreover, under one circumstance, Relypsa must pay this termination fee even if it consummates any Acquisition Proposal (as defined in the Merger Agreement) *within 9 months*

*following the termination* of the Merger Agreement. Finally, and further prejudicing Relypsa, there is no reciprocal termination fee obligation on Galenica. The termination fee will make the Company that much more expensive to acquire for potential purchasers. The termination fee in combination with other preclusive deal protection devices will all but ensure that no competing offer will be forthcoming.

110. The Merger Agreement also contains a "No Solicitation" provision that restricts Relypsa from considering alternative acquisition proposals by, *inter alia*, constraining Relypsa's ability to solicit or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits the Company from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal, but permits the Board to consider an "*unsolicited bona fide written Acquisition Proposal*" if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

111. Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser. Here, the Individual Defendants agreed to provide Galenica information in order to match any other offer, thus providing Galenica access to the unsolicited bidder's financial information and giving Galenica the ability to top the superior offer. Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Galenica.

112. Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Acquisition.

***Conflicts of Interest***

113. As noted above, the sales process leading up to the Proposed Acquisition was rife with conflicts of interest, first and foremost among them being the fact that Relypsa allowed Centerview to act as chief financial advisor throughout most of the process while they were currently engaged by Galenica to do other financial advisory work, including providing advice to Galenica with respect to its planned spin-off of Vifor which the Board recognized would be easier once Relypsa was acquired.

114. This conflict of interest was so clear that the Board later realized it must reach out to BofA Merrill Lynch in order to provide a second advisory opinion, thereby wasting significant

stockholder value by engaging a second financial advisor while keeping on the conflicted Centerview. Moreover, while Centerview ran the process, the Board nevertheless negotiated a fee with BofA Merrill Lynch that was partially contingent on the sale of the Company.

115. Furthermore, the Recommendation Statement indicates that the sales process was engineered from the beginning to favor Galenica, with little to no efforts made by the Company to solicit third party interest during the process. For example, it appears that out of the list of five potential 'counterparties' created by the Board and its advisors, only four were ever contacted. Furthermore, it appears that only one party, Party C, had not independently and previously approached the Company with interest in entering into a strategic transaction. It is therefore obvious that, having only proactively contacted one third party throughout the entire sales process, Relypsa and its Board had a foregone conclusion in their minds about who should be the eventual winner in the sales process – Galenica.

116. This foregone conclusion makes sense, as the business relationship of the two companies goes back to 2013, during which time Galenica began discussing with Relypsa a licensing arrangement for the sale of Veltassa outside the United States. Sensing that further profits could be had at the expense of Relypsa stockholders the Proposed Acquisition ensued. As a result, the Board acquiesced to the $32.00 offer even though it had claimed previously that an offer "closer to $34.00 per Share was more reflective of the value of Relypsa."

117. Additionally, Company directors and officers will receive unique benefits in connection with the merger. Under the terms of the Merger Agreement, upon the consummation of the Proposed Acquisition, each outstanding Company option, equity award, or other right to purchase Company stock will vest and be cancelled in exchange for the right to receive the Merger consideration, instantly converting the large, illiquid holdings of many of the Individual Defendants and other Company insiders into cash. Significantly, upon information and belief, members of the Company's Board and other Company insiders collectively own thousands of such options for which they will receive immediate liquidity.

118. For example, the following table lists the outstanding Company options and equity awards which would be subject to vesting should the Proposed Acquisition be consummated:

| Name | Number of Unvested Company Options | Total Value of Unvested Company Options | Number of Unvested Company RSU Awards | Total Value of Unvested Company RSU Awards |
|---|---|---|---|---|
| John A. Orwin | 389,751 | $ 5,893,776 | 65,625 | $ 2,100,000 |
| Kristine M. Ball | 95,038 | $ 1,014,824 | 24,292 | $ 777,344 |
| Stephen D. Harrison, Ph.D. | 96,980 | $ 399,913 | 17,917 | $ 573,344 |
| Lance Berman, M.D., M.S. | 87,200 | $ 795,046 | 24,292 | $ 777,344 |
| Scott Garland. | 107,918 | $ 944,038 | 17,917 | $ 573,344 |

119. Adding to the impropriety, the Recommendation Statement indicates that Orwin, on several occasions in discussions with Galenica officers, independently brought up and pushed discussion regarding the unvested stock options of the Company, such as those Orwin and other insiders own in the thousands.

120. Moreover, certain employment agreements with several Relypsa officers or directors are entitled to severance packages should their employments be terminated under certain circumstances. These 'golden parachute' packages are significant, and will grant each director or officer entitled to them at the very least, hundreds of thousands of dollars, compensation not shared by Relypsa common stockholders.

121. The following table sets forth the Golden Parachute compensation for certain Relypsa directors and officers, as well as their estimated value payable:

| Name | Cash (1) | Equity (2) | Perquisites/ Benefits (3) | Total |
|---|---|---|---|---|
| John A. Orwin | $ 790,792 | $ 7,993,776 | $ 24,337 | $ 8,808,905 |
| Kristine M. Ball | $ 493,808 | $ 1,792,168 | $ 24,337 | $ 2,310,313 |
| Stephen D. Harrison, Ph.D. | $ 494,425 | $ 973,257 | $ 0 | $ 1,467,682 |
| Lance Berman, M.D., M.S. | $ 535,412 | $ 1,572,390 | $ 8,806 | $ 2,116,608 |
| Scott Garland. | $ 535,412 | $ 1,517,382 | $ 24,337 | $ 2,077,131 |

122. Finally, as the Recommendation Statement makes clear, the Relypsa management team, being seen as "integral" by Galenica, will stay on to run the surviving company. These post-closing positions grant Company insiders extra consideration, which the Plaintiff and other common stockholders of the Company are foreclosed from sharing in as they will be cashed out and forever lose a chance to see a greater return on their investment.

123. Thus, while the Proposed Acquisition is not in the best interests of Relypsa stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete Recommendation Statement***

124. On August 4, 2016, the Company filed with the SEC a materially misleading and incomplete Recommendation Statement which failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Acquisition.

*Omissions and/or Material Misrepresentations Concerning Centerview's Conflict of Interest*

125. As set forth above, Relypsa allowed Centerview to act as chief financial advisor throughout most of the process while they were currently engaged by Galenica to do other financial advisory work, including providing advice to Galenica with respect to its planned spin-off of Vifor which the Board recognized would be easier once Relypsa was acquired.

126. In describing the work Centerview performed for Galenica the Recommendation Statement merely states that Centerview would receive a fee in a "fixed amount" in connection with its advice related to the spinoff of Vifor, which the Recommendation Statement misleadingly describes as an "unrelated financial advisory matter[]" and that "Centerview is entitled to receive fees totaling as much as CHF 8.5 million for its prior work and ongoing work for parent." (emphasis added) Stockholders are entitled to know if Centerview's fee is affected in any manner if the Vifor spinoff is successful. This is material, because Galenica's proposed acquisition of Relypsa will better enable it to spinoff Vifor, as a result stockholders are entitled to a specific description of Centerview's fee in connection with that engagement so they can assess Centerview's conflict of interest. The Recommendation Statement also conveniently omits that Centerview has a 10-year relationship with Galenica.

127. Even more troubling, Centerview has provided advice to Galenica regarding potential acquisition targets. Although the Recommendation Statement does indicate that Centerview provided advice to Galenica related to "potential future acquisitions by Galenica" and that Centerview was "not representing Galenica in connection with a potential acquisition of Relypsa or any related matters" that does not mean Centerview did not provide advice related to an acquisition of Relypsa or an alternative thereto for which it was not formally engaged.

Therefore, the Recommendation Statement was required to disclose whether Centerview provided any advice to Galenica for which it was not formally engaged related to an acquisition of Relypsa or any alternative thereto. Without this information, the Recommendation Statement's disclosures related to Centerview's conflicts of interest are rendered materially false and misleading.

128. Stockholders are also entitled to know whether Centerview used any information or provided any advice related to the proposed Relypsa transaction in connection with its advice related to Galenica's planned spinoff of Vifor. This information is material because it relates to whether Centerview has an improper conflict of interest or misappropriated confidential information and is necessary to ensure the Recommendation Statement's disclosures related to Centerview's conflicts of interest are rendered materially false and misleading.

129. Moreover, the Recommendation Statement does not disclose whether any member of the Centerview team, was currently or previously providing advice to Galenica. This information is material because it relates to the extent of Centerview's conflict of interest and is necessary to ensure the Recommendation Statement's disclosures related to Centerview's conflicts of interest are rendered materially false and misleading.

130. Page 17 of the Recommendation Statement indicates that "[o]n May 22, 2016, John Butler, a member of the Relypsa Board, delivered an e-mail to Mr. Spiegelman, Mr. Orwin and Ronald Krasnow, Senior Vice President and General Counsel of Relypsa, stating that, at that time, Mr. Butler intended to recuse himself from the meeting of the Relypsa Board on the following day and any future discussions to the extent they related to Galenica's proposal to acquire Relypsa or any related transaction process." The Recommendation Statement wholly fails to explain, however, why Mr. Butler recused himself and whether he believed he may have a conflict of interest in connection with the Proposed Transaction. Therefore, this information is necessary to ensure the statements related to Mr. Butler's recusal are not false and misleading.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Acquisition*

131. Specifically, the Registration Statement fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Acquisition. In particular, the Registration Statement fails to disclose the following information

a. What differences existed, if any, between the NDAs entered into by the Company with Galenica, and the Company with any other interested Party throughout the sales process;

b. Did the NDA entered into between Relypsa and Party B contain a "don't-ask-don't-waive" clause, and if so under what circumstances, if any, did it fall away;

c. Was Centerview questioned regarding its relationship with Galenica during Company management's initial meetings with it in the fall of 2014 and, if so, why was Centerview engaged given its relationship with Galenica;

d. What was the specific nature of Centerview's relationship with Galenica;

e. How much Centerview was paid for its services to Galenica within the past two years;

f. What work, if any, has BofA Merrill Lynch performed for Galenica or affiliated entities within the past two years and if they received any such payment for said work;

g. Why Relypsa was willing to discuss a sale of the Company immediately upon Galenica's interest upon such a transaction in April 2016, but did not respond to other such inquiries from Party A made in fall 2014 or Party B made earlier in April 2016.

*Omissions and/or Material Misrepresentations Concerning Relypsa's Financial Projections*

132. The Recommendation Statement fails to provide material information concerning financial projections provided by Relypsa's management, reviewed with Relypsa and relied upon by Centerview and BofA Merrill Lynch in their analyses. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs.,*

*Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007). Here, the Recommendation Statement provides stockholders no information why the Company would not benefit from the evergreening of its patent portfolio. Indeed, Relypsa appears to be in the process of evergreening its patent portfolio currently as it has at least two pending patent applications. In addition, all of the projections assume Relypsa will incur $835 million in research and development costs, but at the same time project for no benefits from that cost. As a result, the Recommendation Statement should explain why the Company is incurring research and development costs and not incurring any benefits. Indeed, if the Company does not intend to spend research and development money on evergreening its patent portfolio and attempting to create new drugs those expenses should not be included in the projections which would increases the Company's future value. Thus, stockholders are entitled to a fair summary of the basis for this illogical assumption. The projections also ignore the possibility that a generic drug manufacturer might not be able to determine the process by which Relypsa manufactures Veltassa and therefore not have the ability to obtain approval through an Abbreviated New Drug Application, which would have the effect as a practical matter of essentially extending the exclusivity period as a generic manufacturer works through a slower drug approval process. Therefore, stockholders are entitled to a fair summary of the basis for management's assumption that this would not occur.

133. Moreover, each of the projection sets assumes the Company will incur in excess of $13 million in annual stock based compensation expense between 2030 and 3032 (which was expected to increase each year). But, the projections also assume that during those years the Company would be in a death spiral. Accordingly, the Company should explain why stock-based compensation expense is increasing at a time when the Company's stock would in theory be dropping in value causing all or some of the stock options to be underwater and therefore worthless. In sum, without a fair summary of the illogical assumptions in Relypsa's projections stockholders will be misled regarding the weight to afford Relypsa's projections.

134. Additionally, with respect to stock-based compensation - the summary of Centerview's discounted cash flow analysis on pages 38 and 39, however, does not disclose whether Centerview reduced Relypsa's value by treating stock-based compensation as a cash

expense. This disclosure is necessary to ensure stockholders or not mislead by the value resulting from BofA's discounted cash flow analysis.

**CLASS ACTION ALLEGATIONS**

135. Plaintiff brings this action as a class action, pursuant to FRCP 23, individually and on behalf of all holders of Relypsa common stock who are being and will be harmed by the Individual Defendants' actions, described herein (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant.

136. This action is properly maintainable as a class action.

137. The Class is so numerous that joinder of all members is impracticable. As of May 2, 2016, there were over 44 million common shares of Relypsa stock outstanding, resulting in hundreds, if not thousands of stockholders.

138. There are questions of law and fact which are common to the Class including, *inter alia*, the following:

a. Whether the Proposed Acquisition is unfair to the Class;

b. Whether Plaintiff and the other members of the Class would be irreparably damaged were the transactions complained of herein consummated;

c. Whether Defendants violated Federal laws;

d. Whether the Individual Defendants are acting in furtherance of their own self-interest to the detriment of the Class;

e. Whether the Class is entitled to injunctive relief or damages as a result of the wrongful conduct committed by the Defendants; and

f. Whether Defendants have disclosed and will disclose all material facts in connection with the Proposed Acquisition.

139. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.

Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

140. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

141. Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

**FIRST COUNT**
**On Behalf of Plaintiff and the Class for Violations of Section 14(e) of the Exchange Act**
**Against Relypsa and the Individual Defendants**

142. Plaintiff repeats and realleges each allegation set forth herein.

143. Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. § 78n(e).

144. Relypsa filed and delivered the 14D-9 to its shareholders, which Defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above.

145. The 14D-9 was prepared, reviewed and/or disseminated by Defendants. It misrepresented and/or omitted material facts, including material information about the consideration offered to shareholders via the Exchange/Tender Offer, the intrinsic value of the Company, and potential conflicts of interest faced by certain Individual Defendants and the Company's financial advisor.

146. In so doing, Defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of

Section 14(e) of the Exchange Act. By virtue of their positions within the Company and/or roles in the process and in the preparation of the 14D-9, Defendants were aware of this information and their obligation to disclose this information in the 14D-9.

147. The omissions and incomplete and misleading statements in the 14D-9 are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares or seek appraisal. In addition, a reasonable investor would view the information identified above which has been omitted from the 14D-9 as altering the "total mix" of information made available to shareholders.

148. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the 14D-9, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the 14D-9, rendering certain portions of the 14D- 9 materially incomplete and therefore misleading.

149. The misrepresentations and omissions in the 14D-9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

**SECOND COUNT**
**On Behalf of Plaintiff and the Class for Violations of Section 14(d)(4) of the Exchange Act**
**Against Relypsa and the Individual Defendants**

150. Plaintiff repeats all previous allegations as if set forth in full herein.

151. The Individual Defendants have issued the Recommendation Statement with the intention of soliciting stockholder support of the Merger.

152. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance

> with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

153. SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

154. The Recommendation Statement violates Section 14(d)(4) and Rule 14a-9 because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, the Individual Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

155. The Individual Defendants were at least negligent in filing the Recommendation Statement with these materially false and misleading statements. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Merger.

156. The misrepresentations and omissions in the 14D-9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

157. Because of the false and misleading statements in the Recommendation Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

**THIRD COUNT**

**On Behalf of the Plaintiff and the Class for Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

158. Plaintiff brings this Exchange Act claim on behalf of himself as individuals and on behalf of all other Relypsa stockholders.

159. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

160. The Individual Defendants acted as controlling persons of Relypsa within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Relypsa, and participation in and/or awareness of the Company operations and/or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

161. Each of the Individual Defendants were provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

162. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Recommendation Statement, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger. They were, thus, directly involved in the making of this document.

163. In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

164. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

165. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(d)(4), 14(e) and SEC

Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A. Declaring that this action is properly maintainable as a class action, certifying Plaintiff as Class representative and certifying his counsel as class counsel;

B. Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees;

D. In the event Defendants consummate the Proposed Transaction, awarding damages to Plaintiff and the Class; and

D. Granting such other and further equitable relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: August 15, 2016

**BRODSKY & SMITH, LLC**

By: ______________________
Evan J. Smith (SBN242352)
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone: (877) 534-2590
Facsimile: (310) 247-0160
*Attorneys for Plaintiff*

# PLAINTIFF'S CERTIFICATION

Servando Morales ("Plaintiff") declares under penalty of perjury, as to the claims asserted under the federal securities laws, that:

1. Plaintiff has reviewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff's transactions in Relypsa, Inc. during the Class Period specified in the Complaint are as follows (use additional sheet if necessary):

| Date | # of Shares Purchased | # of Shares Sold | Price |
|---|---|---|---|
| 7/7/2014 | 150 | None | $26.53 |
| 6/16/2014 | 51 | None | $23.43 |
| 6/12/2014 | 149 | None | $23.35 |

5. During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws. [Or, Plaintiff has served as a class representative in the action(s) listed as follows:]

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct

Sign Name: ________________________
Servando Morales

Address: 16340 Panoramic Way
State, Zip Code: San Leandro, CA 94578
County: Alameda

**BRODSKY & SMITH, LLC**
Evan J. Smith, Esquire
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Phone: (877) 534-2590
Facsimile: (610) 667-9029
esmith@brodsky-smith.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SERVANDO MORALES, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>RELYPSA, INC., DANIEL K. SPIEGELMAN, JOHN P. BUTLER, PAUL J. HASTINGS, KENNETH J. HILLAN, DAVID W. J. McGIRR, JOHN A. ORWIN, THOMAS J. SCHUETZ, and HELEN TORLEY.<br><br>Defendants. | Case No.:<br><br>**L.R. 7.1-1 DISCLOSURE STATEMENT** |

Pursuant to L.R. 7.1-1, Plaintiff Servando Morales hereby states that there are no such parent corporations or any other publicly held corporation that owns 10% or more of its stock as the Plaintiff is an individual.

Dated: August 15, 2016

Respectfully submitted,

**BRODSKY & SMITH, LLC**

By: ______________________________

Evan J. Smith (SBN242352)
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Tel.: (877) 534-2590
Fax: (310) 247-0160